UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| GEOFFREY FULTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NUMBER: 1:16 CV 010 |
| | ) | |
| STARKE COUNTY SHERIFF BILL DULIN | ) | |
| AND OFFICER KYLE HINDS | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

In this excessive force action against the Starke County Sheriff and the arresting officer, Kyle Hinds ("Hinds"), Plaintiff, Geoffrey Fulton ("Fulton") challenges the use of a taser during the course of a traffic stop as well as force he claims was used after he was in handcuffs. Before the court are a slew of motions from the parties including: Defendants' Motion for Summary Judgment [DE 69], Plaintiff's Motion to Strike [DE 74], Defendants' Motion to Strike Pages 4 and 5 of Plaintiff's Exhibit 5 [DE 78], Plaintiff's Motion to File Supplemental Exhibits [DE 82] and Plaintiff's Motion to Withdraw Admission [DE 83]. For the following reasons, Defendants' Motion for Summary Judgment will be DENIED; Plaintiff's Motion to Strike will be DENIED; Plaintiff's Motion to File Supplemental Exhibits and Motion to Withdraw Admissions will be GRANTED; and Defendants' Motion to Strike will be DENIED as MOOT.

## I.     PROCEDURAL and FACTUAL BACKGROUND

Fulton filed the present action asserting an excessive force claim pursuant to 42 U.S.C. §1983 against Hinds in his individual capacity, a claim against Starke County Sheriff Bill Dulin ("the Sheriff") for failure to train under 42 U.S.C.§1983, a state law battery claim against the

Sheriff under the theory of *respondeat superior*, and an official capacity state law claim against the Sheriff for failure to provide adequate jail medical care. These claims arise from the events surrounding Fulton's arrest by Hinds on January 2, 2015 while Hinds was employed as a part-time deputy for the Starke County Sheriff's Department ("the Department").

On September 27, 2017, Fulton dismissed his 42 U.S.C. §1983 claim against the Sheriff for failure to train. This dismissal leaves the §1983 claim against Hinds, and the state law claims against the Sheriff as the sole remaining claims in the action. However, the present Motion for Summary Judgment addresses only the substantive claims against Hinds, the state law battery claim against the Sheriff, and the timeliness of the tort claim notice for the state law claims against the Sheriff. With this clarification the court turns first to the issues involving the timeliness of Fulton's tort claim notice.

### A.  Timeliness of the Tort Claim Notice

As noted above, the events at issue in this case took place on January 2, 2015. Additional events in Fulton's Second Amended Complaint relating to his medical treatment at the jail took place on January 3-4, 2015. Pursuant to the Indiana Tort Claims Act, IC 34-13-3-1 *et seq* ("ITCA"), a tort claims notice must be filed within 180 days, which all parties agree would have been July 1, 2015. The Complaint, Amended Complaint, and the Second Amended Complaint all represent that the tort claims notice was submitted on July 10, 2015 (DE 1, ¶4; DE 28, ¶5; DE 51 ¶5). This date is approximately 189 days from the date of the excessive force claims and 187 days from the date of his claims of inadequate medical care. The tort claims notice was also attached to all of the Complaints and bears the date June 30, 2015. However, in response to the Sheriff's Request for Admission, Plaintiff admitted the notice was submitted on July 10, 2015. (Dfdt's Exh. K, ¶1).

In response to the Defendants' Motion for Summary Judgment relating to the notice's timeliness, Plaintiff filed Exhibits 4 and 5 which are the tort claims notice itself as well as certified mail receipts. (Pltf's Exhs. 4 and 5). Both of these documents bear the date of June 30, 2015. These exhibits spawned the filing of Defendants' Motion to Strike [DE 78] arguing that Plaintiff cannot contradict his prior admission with these documents as Fed.R.Civ.P. 36(b) deems the fact "conclusively established." In turn, this sparked Plaintiff's Motion to Withdraw that admission (DE 83) and his Motion to File Supplemental Exhibits (DE 82) which include the certified mail receipts showing a mailing date of June 30, 2015.

This is much ado about very little in the grand scheme of this case. Pursuant to Fed.R.Civ.P. 36(b):

> **(b) Effect of an Admission; Withdrawing or Amending It.** A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule 16(e), the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits.

In its eighteen page opposition brief to Plaintiff's Motion, Defendants argue that Plaintiff has not demonstrated good cause for the withdrawal, has waived its objection to the admission since discovery is closed, and they are prejudiced by learning that the tort claim notice was, in fact, timely filed.

The Court begins first with the prejudice component. If "it is evident from the nature of the case that [the] merits [of the admission] are contested", the court will not allow the admission to stand absent evidence of prejudice to the opposing party. *Chima v. Hadady Corp.*, No. 2:10 CV 339, 2012 WL 2192165, at *1–2 (N.D. Ind. June 14, 2012 (quoting *Szatanek v. McDonnell Douglas Corporation*, 109 F.R.D. 37, 40 (W.D.N.Y.1985)). An admission will aid the merits of

the case when it bears on a prima facie element. Moreover, the prejudice contemplated by the rule "relates to the difficulty a party may face in proving his case" because of the sudden need to obtain evidence required to prove the matter that had been admitted. *Id.* (quoting *Gutting v. Falstaff Brewing Corporation,* 710 F.2d 1309, 1314 (8th Cir.1983)). However, "[h]aving to prove one's case on the merits is not the type of prejudice that satisfies Rule 36(b)." *Wells v. EMF Corp.*, 757 F. Supp. 2d 796-97 (N.D. Ind. 2010) (quoting *Van Hoose v. Nucor Corp.*, No. 1:06-cv-01565, 2007 WL 2898697, at *1 (S.D. Ind. Apr. 13, 2007)).

Here it is clear that the merits of the admission are contested. Plaintiff has certified mail documents disputing the admission that he filed the notice on July 10, 2015. These documents show the timely submission of a tort claims notice and the green certified mail cards show that an agent of the Sheriff signed them, acknowledging receipt, on July 2, 2015. (Pltf's Exh. B to DE 83, at p. 4). Counsel also submitted an affidavit with his motion in which he certifies that he signed, reviewed, and mailed the notice on June 30, 2015. (Pltf's Exh. C to DE 83). Plaintiff's counsel further acknowledges that when reviewing the Requests for Admission, the reviewing attorney relied upon the scrivener's error in the Complaint and thus, did not catch the error in the date.

As a general matter, the Court is puzzled as to how this case has proceeded for two years without recognition from either side as to whether the tort claims notice was timely. While the Defendants squarely place all the blame on the Plaintiff, there are clear signs that should have put the Defendants on notice that the dates were incorrect, namely the fact that the green cards are signed by Defendants' own agent on July 2, 2015 and not sometime after July 10. Rather, it appears that the Defendants either excuse their own lack of diligence or were lying in wait for

discovery to close to spring the admission on the Plaintiff in hopes of a blindside victory.[1]  While the Court certainly does not condone Plaintiff's counsel's inattention in allowing this case to proceed all the way to summary judgment before it recognized and corrected the error, this Court is hard-pressed to punish Fulton on the merits of his state law claims due to the shortcomings of all the lawyers in this case.

This said, Defendants argue that they "have foregone significant discovery in reliance upon Plaintiff's affirmative admission" and, in addition, "[d]efendants sought no discovery from the Jail's third-party medical provider related to Plaintiff's jail medical claim."  (Response, p. 11). Defendants further assert that they became aware during discovery of an amputation to Plaintiff's toe which Plaintiff believed "was caused by the Jail's alleged failure to properly care for Plaintiff's diabetes while Plaintiff was incarcerated" and "but for Plaintiff's affirmative admission, Defendants would have pursued this information from Plaintiff, deposed Plaintiff's surgeon and any other doctor who treated Plaintiff…"  (Response, pp. 11-12).  Finally, Defendants state that "witnesses key to the Sheriff's Department's defense are no longer available" as they are no longer employed by the Sheriff's Department and they have no information on the individual's whereabouts.  Thus, they assert that reopening discovery will result in substantial additional litigation costs, medical depositions and an independent medical examination, further prejudicing them.

Unfortunately, the only true prejudice that the Defendants have demonstrated is being deprived of a swift and premature victory on a technicality.  Defendants do not deny that they had notice of the Plaintiff's claims or that they had the tort claims notice attached to the Complaints.

---

[1] All of this time and expense is easily avoided where counsel, in the interest of collegiality, make a single phone call and resolve the dispute.  Instead, the Court had to resolve 3 motions and a combined fifty pages of briefing over an issue which at the end of the day is a non-issue.

They also do not deny receiving notice of the Tort Claim on July 2, 2015. Essentially, all of Defendants' claims of prejudice above can be cured with the reopening of discovery. Although several witnesses may be no longer available, there is no allegation that these witnesses would be the sole witnesses and the only evidence available for the Defendants to defend the claims against them. Nevertheless, Defendants contend they have relied on the admission in prosecuting their case, including in filing their summary judgment motion. But as noted, having to defend the case on the merits is not the type of prejudice that satisfies Rule 36(b). Nor is the expense of preparing the motion for summary judgment. And, the additional discovery Defendants will need to conduct will be limited to the state law claims.

In contrast, the prejudice to the Plaintiff in not being able to pursue his claim on the merits is great. Under the circumstances here, permitting withdrawal "would promote the presentation of the merits of the action" and will not unfairly prejudice the Defendants. For this reason, the Plaintiffs' Motion to Withdraw Admission [DE 83] is GRANTED; the Motion to File Supplemental Exhibits [DE 82] is GRANTED; the Defendants' Motion to Strike Exhibits [DE 78] is DENIED as MOOT.

With this issue resolved, we turn to the facts relevant to the Defendants' Motion for Summary Judgment.

## B. **Fulton's Arrest**[2]

On January 2, 2015, Hinds arrested Fulton for Resisting Law Enforcement by flight. Hinds was a full-time officer with the Town of Hamlet Police and a part-time deputy for the Department. On January 2, Hinds was on duty for the Department. Fulton is a 62 year old bail bondsmen and

---

[2] The facts of what occurred at the scene of the traffic stop are largely disputed. Where disputed facts exist, they are set forth as disputed but, as is required on summary judgment, the facts are interpreted favorably to the non-movant.

a former member of law enforcement in California and Indiana. Fulton is also an insulin dependent Type 1 diabetic and has a service animal, Rascal, certified by the American Diabetes Association. Fulton was traveling with Rascal at the time of these events.

At 9:40 p.m. on January 2, 2015, Hinds was sitting at an accident scene in a marked patrol vehicle on the northbound shoulder of US 35 with his emergency lights activated. A vehicle, later determined to be driven by Fulton, passed Hinds northbound without moving over or slowing down. Hinds' partially closed squad car door rattled and his car shook as Fulton's vehicle passed which made him notice the vehicle. Given the failure of the vehicle to slow or move over, Hinds considered this a disregard for officer safety and pulled out onto northbound US 35, turned his siren on, and attempted to initiate a traffic stop on Fulton. After Fulton did not immediately pull over and Hinds followed the vehicle for some distance – the facts suggest ½ to ¾ of a mile. (Exh. 10, at 77, 99). Hinds radioed dispatch and indicated he was in a low speed pursuit. The pursuit did not exceed the speed limit and ended after 38 seconds when Fulton eventually pulled over.

The Department and local law enforcement utilize the same dispatch. Hamlet Police Chief Frank Lonigro ("Lonigro") heard the dispatch, activated his lights and siren and responded as back up to Hinds. When Lonigro activated his lights and siren, his dashcam also activated. The complete dashcam video has been submitted to the court as well as a second video once Fulton was in custody of the events transpiring during Fulton's transport. (*See* Defendants' Exhibits A and C submitted with their Motion for Summary Judgment).

Hinds trailed Fulton for some distance after radioing dispatch without Fulton pulling over his vehicle. Eventually, Fulton pulled over near the top of an overpass on northbound US 35, but did not place his vehicle into the parked position. Hinds, having noticed that the vehicle was not in park, proceeded with caution as he considered the failure to put the vehicle in park a continued

defiance of his lawful authority. Hinds remained at his patrol vehicle and ordered Fulton to place his hands outside the window. Fulton rolled his window down partially but the window was frozen and would not immediately roll down all the way. Hinds, not realizing the window was stuck, believed Fulton was willfully refusing to follow his command to place his hands out of the window as ordered. Hinds then unholstered his firearm and radioed dispatch that Fulton was ignoring officer commands. After repeated commands, Fulton's window was fully down and his hands were outside the window.

It is at this point that the dashcam from Lonigro's vehicle shows him arriving at the scene and parking his patrol vehicle beside Hinds's vehicle. In their briefing, both sides take great liberties in their assessment of what the dashcam video shows or does not show and what can be heard to transpire on the video.

What can be readily discerned from the dashcam video shows Hinds at his squad car with his firearm drawn and Fulton inside his vehicle with his hands outside the window as Lonigro approaches the scene, stops his vehicle and exits. (Exh. A, file ending in 22.27.23 beginning at 2:53). Hinds can be heard yelling commands to Fulton outside Lonigro's vehicle although not all the commands are clearly discernible since the recording takes place from inside the vehicle. At 2:55, Hinds is heard yelling to Fulton "with your right hand put the car in park and then put your hands outside the window." At 3:14, Hinds demands Fulton open the car door from the outside. Fulton can be heard shouting "I have a dog in the car" as well as something else. Hinds then again demands he open his car door from the outside using one of his hands and then to remove his seatbelt with one hand. Hinds stated that Fulton brought both hands inside the vehicle to remove his seat belt and Hinds can be heard yelling "one hand." (Exh. A, file ending in 22.27.43 at 3:31). According to Fulton, because the car was a console shift Camaro, he needed two hands to engage

the brake, put his car in park, and remove his seatbelt. Thus, it does not appear he disputes bringing both hands inside the vehicle briefly.

Fulton is then asked to exit the vehicle with his hands in the air. He does so, although Hinds reminds him twice to keep his hands higher in the air. (*Id.* at 3:35). Hinds instructs Fulton to turn his back to him and begin walking backward toward the sound of his voice. Again, Fulton complies. At this point, Fulton leaves the view of the dashcam. However, Hinds can still be heard yelling commands, albeit they are very difficult to understand. Beginning at 3:50 of the video, Hinds can be clearly heard yelling 4 or more times for Fulton to get on his knees. At some point during all of these events, Fulton admits (although he contradicts it later in his deposition testimony) that he told Hinds he "may" have a firearm in the vehicle. (Exh. A, file 23.07.43 at 2:26: "I told him I could possibly have a gun in the car."). From 4:00 onward in the video, the audio is inaudible and the exchange between the officers and Fulton is unable to be discerned. Likewise, the actual employment of the taser is neither seen on the video nor is there any clear audio of that event.

That said, according to Hinds, once Fulton was not observing the command to get on his knees, he holstered his firearm and drew his taser. Lonigro testified he provided a warning to Fulton that if he did not get down on his knees, Hinds would employ a taser. This warning is not readily heard on the video. The parties then seem to agree that Hinds deployed a single cycle of his taser on Fulton, Fulton fell to the ground and officers Hinds and Lonigro handcuffed him. It is not clear exactly where the taser hit Fulton. Fulton testified he did not recall falling to the ground after he was tased. (Exh. M at p. 83). It is undisputed that Fulton did not resist the officer's attempts to handcuff him after he was tased. The parties are also in agreement that prior to employing the taser, Fulton was not in handcuffs or otherwise subdued by the officers.

It is at this point that the parties' versions of the arrest vary considerably. According to Hinds, once Fulton was handcuffed and searched, Hinds found a folding pocket knife and Fulton's diabetic insulin pump in his possession. (Exh. M at 282; Exh. M-15 photo of knife). Hinds inquired if Fulton was having a diabetic incident, and called for an ambulance. Fulton responded that he felt fine. (DE 70-13 at p. 8). Hinds also called for a tow truck and performed an inventory search of the vehicle. Fulton remained on the ground handcuffed during this time. Hinds did not locate a weapon in the vehicle.

Fulton has a separate account of the events surrounding his handcuffing and arrest. According to Fulton, when he was handcuffed and face-down on the ground, Hinds began the inventory search of his vehicle. Fulton testified that he yelled to Rascal to remain calm as the dog was still in the backseat of the vehicle. Fulton further indicates that Hinds located his cell phone in his car, noticed that it was recording and the screen read "save or delete?" He testified that Hinds questioned him about the recording and then Hinds intentionally deleted the recording.

Fulton testified that Hinds repeatedly asked him about the location of the gun in the vehicle while he was doing the inventory search. In Fulton's words:

> Officer Hinds, while I was handcuffed with my hands behind my back, laying flat on the ground in front of the Starke County Patrol car, pulled my hair and head up and said 'I am going to punt your head across the road unless you tell me where your secret gun compartment is.'

(Exh. M at p. 76). Fulton further testified in his deposition that when he was asked about the gun by Hinds, he told him "I don't have a gun." (*Id.* at 79). However, this testimony is in direct conflict with the statement Fulton made to Officer Lonigro in the squad car at the scene of the events that is recorded in the in-camera video. Despite this inconsistency, Fulton testified in his deposition that Hinds kneed him in his right eye when he pulled his hair and head up, shattering

his glasses and causing his eye to bleed. (*Id.* at 90: "He raised my head up and kneed me with his right knee to my right eye."; *Id.* at 92-94: "He broke my safety glasses…"). Fulton has no recollection as to why the ambulance was called.

That said, upon its arrival, it appears the ambulance checked Fulton's blood sugar using a glucometer and it was in a range normal for Fulton. (DE 70-13 at p. 12). However, because a taser was employed, Starke County Sheriff advised Hinds that Fulton should be cleared by the hospital before transported to the jail. At that point, Fulton was taken to Lonigro's squad car for transport. He did not require separate ambulance transport to the hospital.

As for Rascal, by all accounts during all of these events, he was a dutiful service dog. Fulton testified that while he was on the ground handcuffed he instructed his dog to remain quiet and stay in the back seat of the car. According to Lonigro, he would not have known a canine was in the car but for Fulton notifying him of the dog's presence. (Exh. 6, pp. 11-12). Hinds also indicated the dog was friendly and did not interfere or become threatening. Hinds testified that at Fulton's request, Hinds retrieved his cell phone so that Fulton could contact his wife to come get Rascal. Hinds assisted Fulton in dialing his wife and held the phone for him so he could speak with her. Hinds testified that he did not delete any recordings from the phone. The facts set forth by the parties make no mention of whether Fulton concurs with these events regarding the call initiated by Hinds to his wife. Fulton only discusses his belief that Hinds deleted the video recording he had on his phone.

While in custody in the squad car with Lonigro, Fulton and Lonigro engaged in conversation. During that conversation, when Fulton was advised that he was being taken to the hospital, he stated "I don't need to go to the hospital." (Exh. A, file ending in 23.17.43, at 5:35). He further stated that maybe "he should blame it on my diabetes … (laughter) … that would be

the easy out wouldn't it?" (Exh. A, file ending in 23.28.30, at 1:08). A few minutes later, after Lonigro inquired if he had ever been arrested before, Fulton stated "no, not in my whole life …And I never got treated like I got treated tonight either … I'm not saying necessarily I was treated bad…look at my glasses." (*Id.* beginning at 3:54). Lonigro stated his belief that the glasses were damaged when Fulton fell forward to the ground after being tased. Fulton then disputed this and told Lonigro that the damage to his glasses occurred *before* he was tased. (*Id.*). Fulton has since stated the damage to his glasses occurred after he was tased.

Hinds testified that he saw no weapons in Fulton's hands at any time before or after Fulton exited the car. (Exh. 7, p. 21). No illegal items and no firearms were found either on Fulton's person or in his car. (Exh. 8, Interrogatory 11). The only item found on Fulton when he was searched was the pocket knife.

After receiving a medical clearance at the hospital, Fulton was transported to the Jail. Once at the jail, Fulton asserts that he received inadequate medical care as he suffered a diabetic episode at the jail. As noted in the discussion relating to the tort claims notice, Defendants have not moved for summary judgment on the substance of this claim.

On November 18, 2015, Fulton was tried and found guilty of Resisting Law Enforcement by fleeing from Hinds in his vehicle on January 2, 2015 (Exh. F). Fulton was sentenced to serve one year in prison, all but 30 days of which was suspended, with the 30 days executed to be served on house arrest with 11 months probation to follow. Fulton's probation was terminated early and his felony conviction was reduced to a misdemeanor.

## C. <u>Expert Testimony</u>

Both sides of this case have retained so-called "use of force experts" to opine on whether the actions of Hinds were reasonable and justified under the circumstances. The court need not

detail the opinions of these experts other than to say that their opinions, like the facts in this case, are largely at odds with each other. Plaintiff's expert, Robert Johnson, generally opines that it was *per se* unreasonable for Officer Hinds to deploy his taser and contrary to the model Use of Force Continuum and the Electronic Control Weapons Model Policy (April 2010). In contrast, Defendants' expert, Charles Braun, II, generally opines that the use of force under the circumstance was consistent with the training of the officers.

## II.     APPLICABLE STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.' " *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the

evidence in the record in the light most favorable to the non-moving party and resolve all factual

disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

## III.  DISCUSSION

Before turning to the substance of the Motion for Summary Judgment the court will first

address the Plaintiff's Motion to Strike which bears directly on the evidence submitted for the

excessive force portion of the Plaintiff's claims.

### A.  Plaintiff's Motion to Strike

In his motion to strike, the Plaintiff seeks to strike three pieces of evidence: (1) Defendants'

Exhibit B which purports to be a "Transcript of selected portions of Exhibit A"; (2) Defendants'

Exhibit M-15 (photos of a knife discovered during the search of the Plaintiff); and (3) Defendants'

Exhibit P, paragraphs 1-19 (questions posed to the Plaintiff's expert).

With respect to the first item, according to Plaintiff, the transcript of selected portions of

the videotapes purports to have been prepared by defense counsel "neither under oath or by a

certified court reporter" and it is "at best only the Defendants' version of portions of conversations

purportedly recorded on audio and/or video files produced by the Defendant as their Exhibit 'A.'"

Fulton further argues that it is the recording itself that is the actual evidence of the events and not

the transcript provided by the Defendants.

In response, the Defendants argue that the transcript is not intended to substitute as

evidence of what occurred but rather is a demonstrative exhibit to assist the Court in analyzing the

video evidence that was likewise submitted.  The Defendants further cite to *Stringel v. Methodist

Hospital of Indiana, Inc.,* 89 F.3d 415, 418 (7th Cir. 1996), for the proposition that the transcript is

admissible for demonstrative purposes only and that it may be used as a guide by the Court but not

relied upon if it inaccurately reflects what transpired on the video.  In that case, the Seventh Circuit

concluded that "the transcript is, in any event, no more than a guide; and there is no evidence that the district court treated it as anything more." *Id.* at 423. In this instance, like in *Stringel*, the undersigned has not utilized the transcript provided at all in reaching a determination on summary judgment as to whether the case may move forward. The video evidence supplied by the parties is sufficient for the Court to determine that genuine issues of material fact require a jury to assess the video evidence along with the credibility of the witnesses to determine the facts of the case. For this reason, the Motion to Strike the transcript is DENIED.

Next, Plaintiff seeks to strike photographs of the knife identified by Plaintiff as the one he had in his possession when he was arrested. Plaintiff asserts that Exhibit M-15 should be stricken because there was no evidence that Fulton threatened Hinds with the knife or that Hinds was aware of the knife at the time of the events leading to his arrest. Rather, the knife was located on the Plaintiff after he was in custody and during a pat-down search. As a result, Plaintiff contends the photographs of the knife are irrelevant since they could not possibly have affected the officers' judgments on the scene and simply serve to prejudice the Court against the Plaintiff.

Defendants respond that the existence and presence of the knife is relevant to dispute some of the testimony provided by the Plaintiff's expert, Johnson. Johnson opined that use of the taser was not justified against an unarmed individual who is not actively resisting the police. Defendants, however, point out that the Plaintiff was in fact "armed" with a pocket knife at the time the taser was employed and thus, this serves to call into question the expert's ultimate conclusion about whether force was justified in this case.

Again, however, this is much ado about nothing at this stage in the litigation. The court, as will be explained in detail below, has determined that whether Officer Hinds utilized reasonable force in tasing the Plaintiff is the ultimate question for the jury to decide. The parties do not

disagree that the knife was found on Plaintiff's person during the pat down search. What they dispute is the importance of that evidence in the ultimate conclusions in this case. For instance, the presence of the knife on the Plaintiff may very well be relevant to discredit Johnson's conclusions *at trial*. Likewise, depending on who the jury believes, it may very well believe that it was reasonable for Officer Hinds to treat the Plaintiff as armed, especially if they believe Fulton's own statements to Lonigro that he "told them he may have a gun." However, presently this court is not entitled to weigh the credibility or evidence and thus, based on the facts submitted, the Motion to Strike the photo of the knife is DENIED.

Lastly, Plaintiff seeks to strike testimony from Johnson's deposition wherein he is asked by defense counsel about whether a different expert might conclude that the use of the taser was justified. Plaintiff seeks to strike the testimony because he asserts the testimony implies that the Plaintiff had initially retained a different expert but that expert was released because his conclusion was unfavorable to the Plaintiff.

Defendants again respond that there is no basis to strike this testimony at this stage and the Court agrees since none of these questions factor into the Court's determination on summary judgment. The Motion to Strike testimony from Johnson's deposition is, therefore, DENIED.

However, a word of caution to the parties regarding their experts. The Court has some serious reservations about the appropriateness of not only Johnson's testimony but the Defendants' expert's testimony *at trial* as to the ultimate legal conclusion of whether the force employed against Fulton by Hinds was reasonable. Federal Rule of Evidence 704(a) provides that an opinion is not objectionable just because it embraces an ultimate issue. Experts, however, are not permitted to testify as to their legal conclusions. *Good Shepherd Found. v. Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Indeed, it has long been recognized that expert witnesses are prohibited from reaching

legal conclusions in their testimony or from telling jurors what result to reach on the ultimate issues in a case. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994); *Summerland v. Cty. of Livingston*, 240 Fed.Appx. 70, 81 (6th Cir. 2007) (affirming exclusion of expert opinion that "reasonable" force was not used as inadmissible legal conclusion); Estate of Wright v. Lake Cty., No. 2:13-CV-333 JVB, 2017 WL 3896270, at *4 (N.D. Ind. Sept. 6, 2017) (excluding expert from testifying that jail officials were "deliberately indifferent" to the plaintiff as a legal conclusion). Telling jurors the defendants acted "without justification" or that they acted "reasonably" appears to be precisely such inadmissible expert testimony. *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) ("[T]estimony offering nothing more than a legal conclusion—i.e, testimony that does little more than tell the jury what result to reach—is properly excludable under the Rules."). This limitation is critical because "[i]f an expert's opinion tells the jury what result to reach it usurps the role of the jury and is inadmissible." *James T. Scatuorchio Racing Stable*, No. 5:11-374-DCR, 2014 WL 1664263, at *5. Moreover, an expert's "opinion as to what 'current law' 'mandates' or whether defendants were 'legally' 'justified' in using the force applied against [the plaintiff] usurps the jury's role." *Taylor v. Lemus*, 2015 WL 12698306, at *6 (C.D. Cal. June 17, 2015) (citing *Sloman v. Tadlock*, 21 F.3d 1462, 1468 (9th Cir. 1994). Accordingly, while it is of little consequence here, at trial the scope of these experts' testimony may very well be limited in observation of the rules of evidence. This would seemingly be an issue ripe for discussion and presented thoughtfully in a Motion in Limine prior to trial. In the meantime, the Plaintiff's Motion to Strike is DENIED in its entirety.

### B. Excessive Force Allegations

#### 1. Objective Reasonableness

Turning now to Plaintiff's excessive force claim, this court analyzes claims of excessive force, under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 388-89, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment, we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion. *Id.* at 396, 109 S.Ct. 1865; *Fitzgerald v. Santoro,* 707 F.3d 725, 733 (7th Cir.2013); *Abbott v. Sangamon County, Illinois,* 705 F.3d 706, 724 (7th Cir.2013). Such an analysis is inherently fact-dependent, requiring consideration of such factors as the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers. *Graham,* 490 U.S. at 396, 109 S.Ct. 1865; *Miller v. Gonzalez,* 761 F.3d 822, 829 (7th Cir.2014); *Abbott,* 705 F.3d at 724. Accordingly, the reasonableness of an officer's actions must be assessed from the perspective of a reasonable officer on the scene, not based on the "20/20 vision of hindsight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865; *Fitzgerald,* 707 F.3d at 733; *City and County of San Francisco, California v. Sheehan,* —— U.S. ——, 135 S.Ct. 1765, 1775, 191 L.Ed.2d 856 (2015). That assessment must include a recognition that officers are often forced to make split second judgments in tense, uncertain, and rapidly evolving situations, as to the amount of force necessary in a particular situation. *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865; *Abbott,* 705 F.3d at 724; *Sheehan,* 135 S.Ct. at 1775. The Court thus gives considerable leeway to law enforcement officers' assessments regarding the degree of force appropriate in dangerous situations. *Abbott,* 705 F.3d at 724–25. Throughout the analysis, the reasonableness inquiry is an objective one, which examines whether the officer's actions are objectively reasonable in light of the totality of the facts and circumstances confronting him or her, without regard for consideration

of the officer's subjective intent or motivations. *Graham,* 490 U.S. at 397, 109 S.Ct. 1865; *Miller,* 761 F.3d at 828–29; *Fitzgerald,* 707 F.3d at 733. An officer's use of force is unreasonable if in light of all those circumstances at the time of the seizure, the officer used greater force than was reasonably necessary to effectuate the seizure. *Id.*

In this case, even making as many allowances as the law allows to Officer Hinds, the Court finds that there are genuine issues of material fact as to whether Officer Hinds' use of force violated the Fourth Amendment's reasonable standards under the circumstances. Hinds was initiating a traffic stop because Fulton failed to move over for emergency vehicles engaged in the performance of their duties. Fulton had committed no serious or violent crime and certainly was not an immediate threat to Hinds or anyone else. Likewise, while Hinds pursued Fulton (and Fulton cannot dispute that he resisted by fleeing when he did not immediately pull over[3]), the pursuit, by all accounts was a low speed chase, Fulton made no attempt to truly "flee" by leaving the roadway and the entire incident spanned under a minute. There was no direct threat to the officer, no threat to other drivers on the road or citizens, and no attempts by Fulton to flee from the vehicle once he did stop his vehicle. While both sides significantly embellish what the dashcam videos actually show and Defendants make repeated exaggerated claims that Fulton acted in a threatening manner, *see* DE 70 at p. 14: ("The totality of the circumstances demonstrates that Plaintiff was defiant towards officers' lawful authority, made veiled threats towards the officers, and had engaged in conduct that caused the officers to be reasonably concerned that he had a concealed weapon."), what is absolutely clear is that reasonable minds may differ as to the reasonableness of Officer

---

[3] Fulton was convicted of Resisting by Flight and thus, as a matter of law, Fulton cannot dispute his failure to pull over his vehicle.

Hinds' decision to employ a taser to a suspect who had, from what the court can discern, seemingly surrendered to police.

Hinds makes much of the fact that Fulton may have been armed or that Fulton had, at some point, stated he had a gun in the car. Certainly, it is possible that Fulton was carrying a concealed weapon, but at the time the force was employed, Fulton was walking backward with his hands in the air towards Hinds. No one has made any assertion that Fulton made any sudden movements during the course of walking with his back turned toward the officers, turned around to threaten officers, or did anything other than fail to accede to Hinds' repeated commands to get on his knees.

Moreover, Fulton claims once he was on the ground and handcuffed, Hinds forcefully kneed him in the eye causing his glasses to shatter and his eye to bleed. While Hinds adamantly denies that this occurred and spends much time arguing that such activity, had it occurred, would have been heard on the audio of the dashcam video, this argument is simply not convincing. He uses words like the dashcam "conclusively establishes" and the Plaintiff's account is "blatantly contradicted" by the record. (Def. Brief at 18).[4] The dashcam video from Officer Lonigro's patrol car is anything but conclusive with respect to most of what the parties say occurred in this case. Fulton is only in view for a short period of time, and much of the time one of his hands or both of his hands that are in view. The audio from the dashcam recording is not discernible throughout the stop and the Court's review of the video once Fulton exits the vehicle, shows him being

---

[4]This is the second excessive force case in the last few months where defense counsel has made sweeping statements about what can be viewed on dashcam videos. In *Sheehan v. Noble County Sheriff's Dept., et al*, 2016 WL 7100555, at *1 (N.D. Ind. Dec. 6, 2016), counsel repeatedly used the words "clearly," "blatantly," and "overwhelmingly" in an effort to convince the Court that the defendant officers' actions were reasonable as a matter of law. The undersigned scolded counsel by noting that the use of these words were nothing more than a "linguistic jujitsu" and the evidence did not "as the Defendants contend, 'clearly' contradict or 'blatantly' contradict or 'overwhelmingly' establish anything." *Id.* at *7-*8. The same is absolutely true here.

generally compliant with all the commands Hinds is shouting to him. There are also portions of the video where it is nearly impossible to discern what is being shouted between Hinds and Fulton and the parties seem to concede that the two had difficulty hearing one another. For these reasons alone, the video is only one piece of the puzzle that the jury will need to sort through in determining who it believes.

### 2. <u>Qualified Immunity</u>

Taking the facts in the light most favorable to Fulton, a jury could reasonably conclude that Officer Hinds had violated Fulton's Fourth Amendment rights by using excessive force in arresting him. Hinds, however, argues that qualified immunity shields him from suit because it was not clearly established at the time he arrested Fulton that the force he used violated Fulton's Fourth Amendment rights.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012). In other words, qualified immunity "shields from liability police officers 'who act in ways they reasonably believe to be lawful.' " *Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Qualified immunity is an affirmative defense, but the plaintiff carries the burden of defeating it once it is raised. *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013). To defeat the qualified immunity defense, a plaintiff must show: (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time so that it would have been clear to a reasonable officer that her conduct was unlawful in the situation. *Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). These questions can be addressed in either order. *Pearson v.*

*Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); *Locke v. Haessig*, 788 F.3d 662, 667 (7th Cir. 2015).

Before proceeding further, it is necessary to clarify that Hinds has asserted qualified immunity but only, it appears, as to the use of the taser against Fulton. Hinds contends that it is absolutely incredulous to believe he kneed Fulton in the eye after he was handcuffed and on the ground given the dashcam video and thus, his arguments as to qualified immunity do not consider this allegation as even a possibility. Fulton testified that while he was on the ground handcuffed, Hinds pulled his head up, threatened him and kneed him in the right eye, breaking his glasses. However, as set out above, the Defendants speculation as to what may or may not have been capable of being seen or heard on the video "had it really occurred" is just that, speculative. While the videos will no doubt assist the jury's credibility determination, the videos are limited evidence as to what events occurred once the Plaintiff is viewed walking backwards from his vehicle (at which point, he appears to be complying with Hinds' commands). The dashcam videos lack visibility as to the employment of the taser, what may or may not have been said prior to its use, do not show Plaintiff falling to the ground or being handcuffed, and do not show anything that occurred after he was handcuffed until the ambulance arrived. Moreover, the video recordings generally have inconclusive/inaudible sound and perspective. They are not entirely conclusive of anything, as the Defendants suggest in asserting their position. Thus, taking the facts in the light most favorable to Fulton, the Court has already concluded that there is a jury question to be resolved as to whether any force was employed at all after Fulton was handcuffed; if force was used, what force was it; and was any force employed once Fulton was subdued reasonable.[5]

---

[5] This is not to say that the Plaintiff does not have significant credibility issues to overcome. The record is replete with contradictory statements from him once he was in Officer Lonigro's patrol car, all of which he will need to explain at trial. But, this is for the jury to sort out and not the district court on summary judgment.

Moreover, that officers cannot gratuitously batter arrestees once they are handcuffed is clearly established. Thus, on this basis, qualified immunity must be denied on this portion of Fulton's excessive force claim.

As for deploying the taser, this is a more complicated question to resolve given the underlying factual issues presented with respect to Fulton's claim. "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. This inquiry "must be undertaken in light of the specific context of the case, not as a broad, general proposition." *Id.* at 201; *Ashcroft v. al–Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)) (stating that Courts must not define 'clearly established law at a high level of generality.' "). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* "The dispositive question is whether the violative nature of particular conduct is clearly established." *Id.* (quoting *Mullenix v. Luna*, —— U.S. ——, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

With respect to the use of tasers, the Seventh Circuit has described tasers as "falling somewhere in the middle of the nonlethal-force spectrum." *Abbott*, 705 F.3d at 726. Although describing it as more than a *de minimis* application of force and recognizing the pain that it can cause, the Seventh Circuit has "also acknowledged that the use of a taser, like the use of pepper spray or pain-compliance techniques, generally does not constitute as much force as so-called impact weapons, such as baton launchers and beanbag projectiles." *Id.* For this reason, case law

in this Circuit is clear that employing a taser or pepper spray, albeit even though non-lethal, on an already subdued subject violates clearly established law. *See Lewis v. Downey,* 581 F.3d 467, 478–79 (7th Cir.2009) (denying qualified immunity to officers who applied a Taser to a pretrial detainee lying "prone on [a] bed, weakened, and docile," in response to his refusal of an order to get out of bed); *Brooks v. City of Aurora, Ill.,* 653 F.3d 478, 487 (7th Cir.2011) (noting that prior cases had established the illegality of the use of pepper spray on an arrestee who was "already ... handcuffed and ... offering no physical resistance" or was "lying face down ... with both arms handcuffed behind his back" (internal quotation marks omitted)); *see also Sallenger v. Oakes,* 473 F.3d 731, 741–42 (7th Cir.2007) (noting, in its evaluation of the officers' conduct for immunity purposes, that the fact that the force was applied *after the arrestee was handcuffed* was a significant factor in denying immunity); *cf. Forrest v. Prine,* 620 F.3d 739, 745 (7th Cir.2010) (finding force was not unconstitutionally excessive when Taser was applied "where the officers were faced with aggression, disruption, [and] physical threat" and where plaintiff "posed an immediate threat to safety and order within the jail" (alteration in original) (internal quotation marks omitted)).

Fulton, while cognizant of these cases, maintains that the use of a taser against a subject who is not actively resisting and poses no threat to officer safety similarly violates clearly established law and, while it's a close case, this Court agrees. Fulton points out that he can be seen on the video complying with Hinds verbal commands. He asserts there is no evidence of aggression on the video and that he is not shown threatening the officers in any way. In fact, he points out he is walking backward with his hands in the air toward the officer immediately prior to the time the taser is said to have been employed (the Court cannot view the actual use of this force from the video provided). Likewise, Hinds has not testified that Fulton acted aggressively toward him at the time he exited the vehicle (either physically or verbally), threatened him with a

weapon or did anything other than not follow commands as promptly as Hinds demanded. The only objective basis Hinds had for believing Fulton was either aggressive or non-compliant was his behavior which led to the traffic stop – that is, his failure to yield to stopped emergency vehicles the low-speed chase that ensued for less than a minute afterwards, and the extra time it took Fulton to roll his window down. However, the Seventh Circuit has also made clear that "as the threat changes, so too should the degree of force." *Cyrus v. Town of Mukwonago,* 624 F.3d 856, 863 (7th Cir. 2010). Once Fulton pulled the car over, did not make any further attempt to flee, exited the vehicle without incident and was walking backwards toward Hinds and Officer Lonigro with his hands in the air, he had, for all intents and purposes, surrendered to the lawful authority of the officers.

Nevertheless, Hinds asserts that he can be heard in the video telling Fulton four or five times to get on his knees and that Fulton was not doing so. He contends that by employing the taser he avoided a hands-on confrontation with Fulton. While certainly this could be a factor in his decision to employ a taser rather than some other manner of seizing Fulton, this court has already indicated that whether it was reasonable for Hinds to employ the taser is a question of fact reserved for the jury.

As for clearly established law, the closest cases the Court can find on point are *Clarett v. Roberts,* 657 F.3d 664, 674–75 (7th Cir.2011) wherein the Seventh Circuit upheld the use of a taser in a situation in which a person was refusing to move from a doorway and an officer believed that fellow officers in the blocked room needed assistance, and in *United States v. Norris,* 640 F.3d 295, 303 (7th Cir.2011) where a defendant "displayed an unwillingness to accede to reasonable police commands, and his actions suggested an intent to use violence to fend off further police action." In both those cases, however, there was more than just a refusal to accede to lawful police

commands. There was an actual threat. Moreover, the Seventh Circuit has repeatedly recognized that officers may not use significant force on non-resisting or passively resisting suspects. *Abbott,* 705 F.3d at 732; *see also, Estate of Starks v. Enyeart,* 5 F.3d 230, 233 (7th Cir. 1993).[6]

Here, accepting the facts favorably to Fulton as we must do, the court finds that genuine material fact issues preclude a determination of whether Hinds is entitled to qualified immunity on Plaintiff's excessive force claim relating to Hinds' decision to employ the taser. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find Hinds violated Plaintiff's right to be free from excessive use of force, a right clearly established at the time of his arrest. Indeed, if a jury accepts plaintiff's version of events, that he was not actively resisting, complying with the officer's commands and that he was shot in the back with a taser within seconds of being told to get on his knees, the jury could reasonably find that the use of the taser was excessive. Conversely, if a jury accepts Hinds version of events, that plaintiff was verbally resisting and non-compliant with his orders, it could reasonably find that the force used was not excessive under the

---

[6] Other circuits have likewise drawn distinctions when officers are faced with a passively resisting subject versus one that is actively resisting or threatening officers. "If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Hagans v. Franklin County Sheriff's Office,* 695 F.3d 505, 509 (6th Cir. 2012) (collecting cases). "By contrast, when we have found excessive force, the suspects were compliant or had stopped resisting." *Ibid.* "A suspect's active resistance also marks the line between reasonable and unreasonable tasing in other circuits." *Id.* at 509-10 (citing *Cavanaugh v. Woods Cross City,* 625 F.3d 661, 665 (10th Cir. 2010) (tasing non-resistant suspect was excessive force); *Oliver v. Fiorino,* 586 F.3d 898, 906–07 (11th Cir. 2009) (tasing suspect ten times was excessive force because he stopped resisting after the first shock); *Brown v. City of Golden Valley,* 574 F.3d 491, 498–99 (8th Cir. 2009) (tasing car passenger who was not attempting to flee or resist arrest was excessive force); *Casey v. City of Fed. Heights,* 509 F.3d 1278, 1282 (10th Cir. 2007) (tasing a non-violent misdemeanant who was not offering any resistance was excessive force)). In *Thomas v. Plummer,* 489 Fed.Appx. 116 (6th Cir. 2012), the Sixth Circuit plainly held as follows: "The question presented is whether an officer's tasing a once-disobedient suspect who has stopped resisting constituted excessive force, as of August 23, 2009. We hold that it did." *Id.* at 125. The court of appeals noted that it had "applied this general rule in the context of taser use, holding that a suspect not resisting arrest had a clearly established right not to be tased, as of October 28, 2006." *Id.* at 126 (citing *Kijowski v. City of Niles,* 372 Fed.Appx. 595, 601 (6th Cir. 2010)).

circumstances. Consequently, the Court denies Hinds' motion for summary judgment on his entitlement to qualified immunity concerning Plaintiff's excessive force allegations.

### C.  State Law Claim

Defendants also seek summary judgment on Plaintiff's state law *respondeat superior* battery claim against Sheriff Dulin. The parties agree that the state law claim as to whether reasonable force was used is identical to the federal standards. For the same reasons detailed above, the Court DENIES the Motion for Summary Judgment on the state law battery claim.

### IV.    CONCLUSION

Based on the discussion above, Defendants' Motion for Summary Judgment is DENIED [DE 69]; Plaintiff's Motion to Strike is DENIED [DE 74]; Plaintiff's Motion to File Supplemental Exhibits [DE 82] and Motion to Withdraw Admissions [DE 83] are GRANTED; and Defendants' Motion to Strike will be DENIED as MOOT [DE 78].

Within 14 days, the parties SHALL consult and present a joint motion to reopen discovery as to the limited issue of Plaintiff's claim against Sheriff Dulin regarding the medical care he received in jail. In that motion, the parties SHALL include a deadline for the filing of supplemental dispositive motions that is no later than 30 days from the close of the reopened discovery.

Entered: This 29th day of May, 2018

s/William C. Lee
United States District Judge